# Exhibit "A"

# Equipment Finance Agreement

**CONTINENTAL BANK**
15 W. South Temple, Suite 300, Salt Lake City, UT 84101
Phone: (801) 595-7000 Fax: (801) 595-7053

# EQUIPMENT FINANCE AGREEMENT

| | |
|---|---|
| **CUSTOMER:**<br>**Pyle Transportation, Inc.**<br>**104 East 1st Street**<br>**Schaller, Iowa 51053** | **CONTRACT NO.: 503897**<br>**DATE: 3/27/2024**<br>**SECURED PARTY: Continental Bank ("Continental")** |

**EQUIPMENT DESCRIPTION:**

**2019 Kenworth Construction W900, VIN #1XKWD49X8KJ253221**

The term "Equipment" in this Agreement shall include the description above, Schedule 1, if any, and shall also include all present or future additions, accessions, attachments, accessories, replacements, and substitutions to the foregoing property, all tools, manuals and records for such property, and the products and proceeds thereof, including proceeds in the form of goods, accounts, rents, chattel paper, documents, instruments, general intangibles, insurance proceeds and rental proceeds payable because of loss or damage to the Equipment, and all returned or repossessed goods arising from or relating to any of the property described herein.

**TOTAL AMOUNT PAID TO VENDORS: $59,119.93**

**TERM:** The term of this agreement shall be for a period of **36** months.

**LOCATION OF EQUIPMENT:**
**104 East 1st Street, Schaller, Iowa 51053**

**PAYMENT:**

| Payment Start Date | # of Payments | Payment Amount |
|---|---|---|
| 05/03/2024<br>**30 days after funding** | 36 | $1,897.95 |

**1. AGREEMENT:** Subject to the terms of this Agreement, Continental has agreed to provide financing for Customer's acquisition of the personal property described above and/or, if any, on the Equipment Description Schedule attached hereto as **Schedule 1** and made a part hereof. Such personal property together with any replacement parts, additions, repairs or accessories now or hereafter incorporated in or affixed to it is, hereinafter, collectively referred to as the "Equipment".

**2. PAYMENTS:** Customer agrees to pay Continental the payments in the amounts and on the dates set forth above. Each payment hereunder shall be made in lawful money of the United States and shall be payable to such account or address as Continental shall from time to time direct. All amounts received hereunder or in respect of this Agreement shall be applied, in Continental's sole discretion, first to accrued late charges and any other costs or expenses due and owing hereunder; second to accrued interest; and third to unpaid principal. Failure to pay this Agreement or any installment due hereunder promptly when due, or default or failure in the performance of any of the terms, conditions or obligations hereunder or in any other agreement or instrument between Customer and Continental shall entitle Continental the right to charge interest at the default rate of 21% on any amounts due hereunder and to proceed at once to exercise the remedies set forth in section 15 below or otherwise available at law or equity.
All other amounts due hereunder shall be paid when due as specified in the terms of this Agreement, or where not so specified, upon Customer's receipt of Continental's invoice. If there is a default, any payments under this Agreement may be applied to the Obligations (as defined below), in Continental's sole discretion, as follows: first, to accrued late charges, fees, and any other costs or expenses due and owing hereunder (or at Continental's option, and without notice to Customer, some or all of these charges, fees, costs and/or expenses may be deferred until immediately after the last payment due hereunder has been made); and second, to the past due monthly payments; with payment first being applied to the most past due amounts and last to the most recent past due amounts.

**3. LATE CHARGE AND OTHER FEES:** If a payment is not received within ten (10) days of the due date, a late charge shall be imposed in the amount of five percent (5%) of the unpaid monthly payment amount. Late charges shall be payable by Customer upon demand, but no later than the next scheduled monthly payment, and failure to pay the same shall constitute an event of default. The right of Continental to impose a late charge shall not be considered as a waiver by Continental of the right to insist upon strict performance of the terms of this Agreement. In addition to late fees, Customer agrees to pay to Continental (1) one-hundred dollars ($100.00), or the highest amount allowed by law, for each check returned for non-sufficient funds or any other reason, (2) one-hundred dollars ($100.00), or the highest amount allowed by law, for each ACH payment (made through the electronic network for financial transactions) which is reversed or voided or any reason, and (3) amendment, modification and extension fees, in amounts which are discretionary with Continental, for each amendment, modification or extension in an amount no less than $250.00. Upon maturity of this Agreement, that is, upon reaching the end of the term, which means when the final payment due hereunder is due and payable or when the Agreement has either been

accelerated or terminated pursuant to any provisions herein, Customer agrees to pay interest on the remaining payments and all accrued and unpaid amounts due hereunder (including, but not limited to, late fees, returned check fees, ACH charges, and fees for amendments, modifications, or extensions of the terms of this Agreement and for other fees allowed for by this Agreement, any other agreements entered into between the parties and/or pursuant to Continental's policy, including but not limited to sales tax, use tax, force placed insurance premiums, property taxes, storage fees, inspection fees etc.) at a rate of 21% per annum until paid in full.

**4. SECURITY INTEREST; AUTHORIZATION:** Customer hereby grants Continental a security interest in the Equipment to secure performance by Customer of its obligations under this Agreement and under any other present or future agreement with Continental (collectively, the "Obligations"). Customer shall insure that such security interest is and shall remain a sole first lien security interest in the Equipment. Customer authorizes Continental to file a financing statement, electronically or otherwise, describing the Equipment from time to time in any Uniform Commercial Code ("UCC") filing office. Customer agrees to pay all costs of preparing and filing any such financing statement. Customer shall not allow any other party to have liens, security interests or UCC financing statements as encumbrances on the Equipment. Continental may hold the Equipment as collateral until all the duties and Obligations of Customer pursuant to this Agreement or any other agreement between Customer and Continental have been fully satisfied. Accordingly, Continental shall have the following rights:

(4.1) Continental may take such steps as it deems necessary or desirable to protect, maintain, repair, or insure the Equipment or satisfy any liens against the Equipment and to store or care for the same and may charge any costs involved in so doing to the Customer.

(4.2) Upon any default, any income from the Equipment, including rents, dividends, interests, proceeds of any insurance or other income of any type shall be and become the property of Continental.

(4.3) At its option, Continental may apply any cash which may be received through liquidation, sale or retirement of any of the Equipment to the payment of any deficiencies which may, at the time of such liquidation, sale or retirement be due and owing Continental under this Agreement. In the event that there is a liquidation, sale or retirement of the Equipment while the Agreement is not in default, Customer shall immediately replace the Equipment with Equipment of equal value and liquidity as deemed reasonable by Continental. Notwithstanding, this or any other provision of this Agreement, Customer shall not have the right, without prior written approval from Continental, to sell, lease or otherwise dispose of the Equipment.

(4.4) Customer shall not lease or sublease the Equipment and shall not allow a third party or any other person or entity, who is not a W-2 employee of Customer, to operate, use or take possession or control of the Equipment, at any time, without prior written approval from Continental.

(4.5) Customer hereby duly appoints Continental true and lawful attorney, coupled with an interest, in fact to sign in the name, place, and stead of Customer any UCC Financing Statement or Fixture Filing pertaining to the Equipment.

**5. CUSTOMER REPRESENTATIONS:**

(5.1) Ownership; No Encumbrances. Customer is and will be the owner of all Equipment free and clear from all charges, liens, security interests, adverse claims and encumbrances of any and every nature; except for the security interest granted herein to Continental.

(5.2) No Third Party Financing Statements. During the term of this Agreement, there will be no other financing statement or similar filing on file in any public office covering any part of the Equipment, and Customer will not execute any such financing statements or similar documents, except the financing statements filed or to be filed in favor of Continental or, only if allowed by Continental in writing, to those filed by third parties who have properly subordinated their interests in favor of Continental.

(5.3) Accuracy of Information. All information furnished to Continental concerning Customer, the Equipment and the Obligations hereunder or for the purpose of obtaining or maintaining credit, is or will be at the time the same is furnished, accurate and complete in all material respects.

(5.4) Addresses. The address of Customer designated at the beginning of this Agreement is Customer's principal place of business. Customer agrees not to change such address without advance written notice to Continental.

**6. GENERAL COVENANTS:**

(6.1) Operation of the Equipment. Customer agrees to use the Equipment solely in the conduct of its own business, in a careful and proper manner, and in conformity with all applicable permits or licenses. Customer shall comply in all respects with all applicable statutes, laws, ordinances, and regulations. Customer shall not use the Equipment in any unlawful manner or for any unlawful purposes, or in any manner or for any purpose that would expose the Equipment to unusual risk, or to penalty, forfeiture or capture, or that would render inoperative any insurance covering or issued in connection with the Equipment.

(6.2) Certain Changes Prohibited. Customer shall not (a) sell or transfer, or permit the sale or transfer of any shares of its capital stock or other ownership interest in the Customer to any person, persons, entity or entities (whether in one single transaction or in multiple transactions) which results in a transfer of a majority interest in the ownership and/or the control of the Customer from the person, persons, entity or entities who hold ownership and/or control of the Customer as of the date of this Agreement; or (b) consolidate with or merge into or with any other entity, or (c) sell, transfer, lease or otherwise dispose of all or substantially all of Customer's assets to any person or entity.

(6.3) Notices and Reports. Customer shall promptly notify Continental in writing of any change in the name, identity or the structure of Customer, any charge, lien, security interest, claim or encumbrance asserted against the Equipment, any litigation involving the Equipment, any theft, loss, injury or similar incident involving the Equipment, and any other material matter adversely affecting Customer or the Equipment. Customer shall furnish reports, information and data regarding Customer's financial condition and operations, the Equipment and such other matters as Continental may request from time to time, including but not limited to bank statements. Customer will, within 30 days upon request, deliver to Continental (i) Customer's most recent fiscal year-end balance sheet and statement of income certified to by a recognized firm of certified public accountants or by Customer's Chief Financial Officer, as being prepared in accordance with generally accepted accounting principles consistently applied, (ii) its tax returns after filing and (iii) copies of Customer 's quarterly balance sheet and statement of income for the quarter just ended, certified by Customer 's Chief Financial Officer.

(6.4) Landlord's Waivers. Customer shall furnish to Continental, if requested, a landlord's and/or mortgagee's waiver of all liens with respect to any Equipment covered by this Agreement that is or may be located upon leased or mortgaged premises, such waivers to include permission to remove the Equipment from the premises and to be in such form and upon such terms as are acceptable to Continental.

(6.5) Protection of Equipment. Continental, at its option and without prior notice to Customer, whether before or after default, but without any obligation to do so, may: (a) discharge taxes, claims, charges, liens, security interests, assessments or other encumbrances of any and nature at any time levied, placed upon or asserted against the Equipment; (b) place and pay for insurance on the Equipment, including insurance that

only protects Continental's interest; (c) pay for the repair, improvement, testing, maintenance and preservation of the Equipment; (d) pay any filing, recording, registration, licensing or certification fees or other fees and charges related to the Equipment; or (e) take any other action to preserve and protect the Equipment and Continental's rights and remedies under this Agreement as Continental may deem necessary.
Customer further agrees to reimburse Secured Party within ten (10) days upon demand for any payment made or any expense incurred by Continental pursuant to this authorization. These payments and expenditures, together with interest thereon from the date incurred until paid by Customer, at a rate of 21% per annum, shall constitute additional obligations and shall be secured by and entitled to the benefits of this Agreement.

(6.6) Inspection. Customer shall at all reasonable times allow Continental, by or through any of its officers, agents, attorneys or accountants, to inspect the Equipment, wherever located, and to examine and make extracts from Customer 's books and records. Customer shall, if requested by Continental, mark and identify the Equipment or portions thereof with such information and in such manner as Continental may request to identify Continental's interest therein, and replace promptly any such marking or identification which are removed, defaced or destroyed.

(6.7) Total Loss of Items of Equipment. If any item of Equipment is totally destroyed, irreparably damaged, lost, stolen or title thereto shall be requisitioned or taken by any governmental authority under the power of eminent domain or otherwise, Customer shall, at the option of Continental, replace the same with like property in good repair, condition and working order (the "Replacement Equipment"), or pay to Continental all amounts secured by such item of Equipment (including any prepayment fees), whether due or to become due, less the net amount of insurance proceeds, if any, actually received by Continental from insurance for such destruction, damage, loss, theft, requisition or taking. In the event the item of Equipment is replaced in accordance herewith, Customer agrees that, at the time the item of Equipment is replaced, this Agreement shall automatically be deemed amended to include the Replacement Equipment as collateral to this Agreement. All rights of Continental regarding the Equipment shall be applied to the Replacement Equipment as if it were the original Equipment.

(6.8) Cross Collateral and Cross Default. All Equipment leased or owned by Customer, in which Continental has an interest, shall secure the payment and performance of any and all of Customer's liabilities and obligations to Continental, whether joint or several, direct or indirect, absolute or contingent, due or to become due, and whether presently existing or hereafter acquired or arising or otherwise created and whether resulting from this Agreement or any other agreement between the parties. Customer further agrees that Continental's interest in the Equipment shall not be terminated in whole or in part until each and all liabilities and indebtedness of every kind, due or to become due, owed by Customer to Continental, whether by this Agreement or any other agreement between the parties, is fully paid and satisfied. Customer's default under the terms of any agreement with Continental shall at Continental's election be deemed an event of default under any one or more or all the agreements Customer has with Continental. Customer understands that this Agreement creates and grants to Continental cross-collateral and cross-default rights between and among all of Customer's contractual obligations and agreements with Continental. All rights granted to Continental herein shall be cumulative and not alternative, shall be in addition to, and shall in no manner impair or affect Continental's rights and remedies under any existing account, agreement, statute or rule of law. CUSTOMER EXPRESSLY WAIVES ANY RIGHTS IT MAY HAVE UNDER THE UNIFORM COMMERCIAL CODE TO A TERMINATION OF ANY PAID IN FULL ACCOUNT SO LONG AS ANY ACCOUNT COVERED HEREIN HAS NOT BEEN SATISFIED IN FULL.

(6.9) Recording of Telephonic Communications. All telephonic communications between Customer and Continental are subject to recording by Continental and Customer acknowledges and consents to same

**7. NO WARRANTY: CUSTOMER ACKNOWLEDGES THAT CONTINENTAL IS NOT THE MANUFACTURER, MANUFACTURER'S AGENT, SUPPLIER OR SELLER OF THE EQUIPMENT AND THAT CONTINENTAL MAKES NO WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, OF ANY KIND, INCLUDING BUT NOT LIMITED TO, WARRANTY OF TITLE, THE FITNESS FOR A PARTICULAR USE OR OTHERWISE, INCLUDING BUT NOT LIMITED TO QUALITY, DESIGN, CONDITION, CAPACITY, SUITABILITY, MERCHANTABILITY OR PERFORMANCE OF THE EQUIPMENT OR OF THE MATERIAL OR WORKMANSHIP THEREOF, IT BEING AGREED THAT THE EQUIPMENT IS FINANCED "AS IS" AND THAT ALL SUCH RISKS, AS BETWEEN CONTINENTAL AND THE CUSTOMER, ARE TO BE BORNE BY THE CUSTOMER AT ITS SOLE RISK AND EXPENSE. CUSTOMER ACCORDINGLY AGREES NOT TO ASSERT ANY CLAIM WHATSOEVER AGAINST CONTINENTAL BASED THEREON. CUSTOMER UNDERSTANDS AND ACKNOWLEDGES THAT NO BROKER, SUPPLIER OR SELLER, NOR ANY SALESMAN, BROKER, OR AGENT OF ANY BROKER, SUPPLIER OR SELLER, IS AN AGENT OF CONTINENTAL. NO BROKER, SUPPLIER OR SELLER, NOR ANY SALESMAN, BROKER, OR AGENT OF ANY BROKER, SUPPLIER OR SELLER, IS AUTHORIZED TO WAIVE OR ALTER ANY TERM OR CONDITION OF THIS AGREEMENT, AND NO REPRESENTATION AS TO THE EQUIPMENT OR ANY OTHER MATTER BY THE BROKER, SUPPLIER OR SELLER, NOR ANY SALESMAN, BROKER, OR AGENT OF ANY BROKER, SUPPLIER OR SELLER, SHALL IN ANY WAY AFFECT CUSTOMER'S DUTY TO MAKE THE PAYMENTS AND TO PERFORM CUSTOMER'S OBLIGATIONS SET FORTH IN THIS AGREEMENT.** Customer waives any right to (a) cancel or repudiate this Agreement; (b) reject or revoke acceptance of the Equipment; or, (c) recover from Continental any general, special, incidental, or consequential damages, for any reason whatsoever. Continental shall not be liable to Customer for any loss, damage or expense of any kind or nature caused, directly or indirectly, by any Equipment, title thereto or the use or maintenance thereof or the failure of operation thereof, or the repair, service or adjustment thereof, or by any delay or failure to provide any such title, maintenance, repairs, service or adjustment, or by any interruption of service or loss of use thereof or for any loss of business howsoever caused. The Equipment shall be shipped directly to Customer by the supplier thereof. Customer agrees to accept such delivery. No defect or unfitness of the Equipment and/or its title, nor any failure or delay on the part of the manufacturer, supplier, seller or the shipper of the Equipment to deliver the Equipment or any part thereof to Customer, including but not limited to title, shall relieve Customer of the obligation to pay or perform any obligation under this Agreement. Customer acknowledges and agrees that this Agreement is a finance agreement, Customer has selected the Equipment and requests Continental to finance the Equipment for Customer under the terms herein.

**8. NON-ASSIGNABILITY BY CUSTOMER:** NEITHER THIS AGREEMENT NOR CUSTOMER'S RIGHTS HEREUNDER, INCLUDING, BUT NOT LIMITED TO, THE POSSESSION AND USE OF THE EQUIPMENT, SHALL BE ASSIGNABLE BY CUSTOMER WITHOUT THE WRITTEN CONSENT OF CONTINENTAL. FURTHER, CUSTOMER SHALL NOT TRANSFER IN WHOLE OR IN PART THE POSSESSION OF THE EQUIPMENT WITHOUT THE WRITTEN CONSENT OF CONTINENTAL.

**9. MAINTENANCE AND USE:** Customer is the owner of the Equipment and shall maintain it in a good and safe operating condition and working order, using as a guide the maintenance program prescribed in the owner's manual, if any, for each item of Equipment, and shall

perform, all that is required to insure full validation of a manufacturer's warranty, if any, on the Equipment. In addition, Customer shall repair and provide replacement parts necessary to keep the Equipment in a good and safe operating condition and working order. All replacement parts, as required hereunder, shall immediately become the subject to the security interest granted hereunder. Customer shall not modify or alter the Equipment in any manner that would reduce its value, capabilities or marketability. It is understood that Continental assumes no obligation whatsoever for the maintenance, repair or replacement of the Equipment or any portion thereof. The Equipment shall be used solely in the conduct of Customer's business. Customer warrants that this is a commercial and business transaction and that the Equipment is used for commercial or business purposes and not for consumer, personal, home or family purposes.

**10. RISK OF LOSS-INSURANCE-INDEMNITY-LIABILITY INSURANCE:**

**10.1. RISK OF LOSS:** Customer hereby assumes and shall bear the entire risk of loss and damage to the Equipment from any cause whatsoever, regardless of whether the loss is insured.

**10.2. PROPERTY INSURANCE:** During the term of this Agreement, Customer shall cause the Equipment to be insured against all perils and all risks, including but not limited to, fire, theft, accident, water and other risks normally and customarily insured against with an insurer acceptable to Continental, ***the Equipment to be scheduled on Customer's policy in the amount of the full insurable replacement cost of the Equipment. Continental shall be named as Loss Payee*** under such policy(ies) to the extent of Continental's interest. A certificate and endorsement of insurance providing for thirty 30 days' notice of cancellation to Continental shall be furnished by all Insurers. The proceeds of such insurance payable as a result of loss or damage to any or all of the Equipment shall be applied at the sole option of Continental as follows:

(A) toward the replacement, restoration or repair of the Equipment which may be lost, stolen, destroyed or damaged: or,

(B) toward the payment of any Obligations of Customer hereunder or arising out of Customer's use and possession of the Equipment.

**10.3. INDEMNITY-LIABILITY INSURANCE:** Customer agrees to indemnify and hold harmless Continental against claims, losses, damages, and liability of any kind or nature and all costs and expenses in connection therewith (including attorney's fees), including, but not limited to, the liability arising under any statute, ordinance or regulation in connection with the use of the Equipment, and against liability from any claim for personal injury, death, or property damage to any person or party, including Customer, by reason of the manufacture, condition, purchase, ownership, delivery, possession, storage, maintenance, repair, return, transportation, installation, use, operation or disposition of the Equipment. Such indemnification shall survive the expiration, cancellation, or termination of this Agreement. To insure such indemnification and hold harmless agreement, Customer shall obtain and maintain in good standing at all times during the term of this Agreement ***General Liability Insurance and Business Auto Insurance in the minimum amount of $1,000,000.00***, with Continental named as Loss Payee.

**10.4. FAILURE TO INSURE OR PAY FOR INSURANCE:** If Customer fails to provide or maintain any insurance required by this Agreement, Continental shall have the right, but not the obligation, to secure insurance on the Equipment in such form and amount as Continental deems reasonable to protect Continental's interests. Customer understands that if Continental secures insurance on the Equipment the insurance may not name Customer as an insured and may not fully protect Customer's interests. Customer agrees that if Continental secures insurance on the Equipment, Customer will pay an insurance charge that may be substantially higher than the premium that Customer would pay if Customer placed said insurance independently. Customer agrees that, in addition to the premium, the insurance charge Customer is required to pay Continental will include interest of 21% per annum and administrative and processing fees, which will result in profit to Continental and its agents. All sums so incurred or expended by Continental shall be, without demand, immediately due and payable by Customer.

**11 NON CANCELLABLE AGREEMENT; PREPAYMENT; NO OFFSET: THIS AGREEMENT IS NON CANCELLABLE BY CUSTOMER FOR ANY REASON WHATSOEVER.** CUSTOMER MAY PREPAY THE INSTALLMENT PAYMENTS IN FULL (BUT NOT IN PART) PROVIDED THAT THERE SHALL BE A DECLINING PREPAYMENT FEE EQUAL TO 3% DURING YEAR 1, AND 2% THEREAFTER OF THE PRINCIPAL BALANCE THAT SHALL BE DUE AND PAYABLE TOGETHER WITH THE PRINCIPAL BALANCE INCLUDING ADDITIONAL FEES THEN DUE AS OF THE DATE PREPAYMENT IS MADE. CUSTOMER'S OBLIGATION TO MAKE ALL PAYMENTS HEREUNDER IS ABSOLUTE AND WILL NOT BE SUBJECT TO ANY RIGHT OF PREPAYMENT, EXCEPT AS STATED HEREIN, ABATEMENT, REDUCTION, COUNTERCLAIM, RECOUPMENT, OFFSET OR DEFENSE

**12. PERMITS, BONDS, LICENSE AND TAXES:** If required, because of Customer's use and/or possession of the Equipment, Customer shall obtain and provide all necessary permits, bonds, and licenses required or necessary for the installation, use, operation and/or transportation of the Equipment. Except as otherwise provided herein, Customer shall pay, as the same shall become due and payable, all taxes, fees, or other governmental charges levied against the Equipment by reason of its use or ownership by any governmental entity or agency, including, without limitation, personal property taxes. Within thirty (30) days following the date on which such tax, fee or other charges becomes due and payable, Customer shall deliver to Continental written proof of payment thereof, upon request by Continental. In the event Customer shall fail or refuse to pay any such tax, fee or other governmental charge, Continental shall have the right to pay the same and Customer shall reimburse Continental on demand for all sums so paid by Continental. In the event of Customer's failure to pay when due any such reimbursement for permits, bonds, licenses, or taxes paid by Continental, Continental shall have the right to apply any monies received from Customer to said reimbursement and any unpaid amounts shall be assessed interest at the rate of 21% per annum until paid.

**13. INSTALLATION OF GPS:** Continental, within its sole discretion, may require that the Equipment be equipped with a GPS tracking device ("GPS"). Customer agrees that this option to install and maintain a GPS on the Equipment is a material condition for Continental to finance Customer's acquisition of the Equipment. Customer understands that it may be able to finance equipment from another creditor that may not require installation of a GPS. Nevertheless, Customer choses to purchase the Equipment with financing from Continental and consents to have the GPS installed. If Continental exercises its right to install and maintain a GPS on the Equipment, Customer shall sign a separate GPS Agreement and the GPS Agreement is incorporated into and made a part of the EFA. Continental may exercise its right to install and maintain a GPS on the equipment at any time prior to termination of the EFA. Customer shall fully cooperate with Continental in installing and maintaining the GPS.

**14. EVENTS OF DEFAULT:** An event of default shall occur if:

(14.1) Customer fails to pay, when due, any payment and such failure continues for a period of ten (10) days.

(14.2) Customer fails to perform as required any other covenant, condition, provision or agreement herein set forth and such failure continues for a period of fifteen (15) days.

(14.3) Customer or any guarantor becomes insolvent or is the subject of a petition in bankruptcy, either voluntary or involuntary, or makes an assignment for the benefit of creditors, or is named in, or the Equipment is subjected to, a suit for the appointment of a receiver, or any action is taken for the dissolution of Customer, if Customer be a corporation, partnership or limited liability company ("LLC").
(14.4) Customer has made any misleading or false statement or representation in the application for or performance of this Agreement.
(14.5) The Equipment or any part thereof shall be subject to any lien, levy, seizure, assignment, transfer, encumbrance, attachment, execution or sale without prior written consent of Continental, or Customer abandons the Equipment or permits any other entity or person the use of the Equipment without the prior written consent of Continental.
(14.6) The occurrence of a material adverse change in Customer's or any guarantor's financial condition or credit rating.
(14.7) The death or judicial incompetence of Customer, if an individual; or of any guarantor.
(14.8) Customer or any guarantor defaults in the performance of any obligation owed pursuant to any other agreement with Continental.

**15. REMEDIES:** Upon the occurrence of an event of default, Continental shall have the rights and remedies available under the Uniform Commercial Code ("UCC"), any applicable Federal, State or local law, and those remedies provided by written agreement between the parties, and in connection therewith Continental, among other things, may: (a) exercise its right of offset by taking funds from Customer's deposit account(s) to make payment towards any amounts due pursuant to this Agreement; (b) declare all amounts due hereunder immediately due and payable with respect to any or all Items of Equipment without notice or demand to Customer; (c) take possession of or, if deemed appropriate, render unusable any or all Items of Equipment, without demand or notice, wherever located, without any process of law and without liability for any damages occasioned by such taking of possession including damages to contents; (d) require Customer to assemble any or all Items of Equipment at a location designated by Continental; (e) sell or otherwise dispose of any Items of Equipment, whether or not in Continental's possession, at public or private sale and apply the net proceeds of such sale after deducting all costs of such sale, including, but not limited to, costs of transportation, repossession, storage, refurbishing, advertising, commissions and brokers fees, to the Obligations with Customer remaining liable for any deficiency, and/or (f) utilize any other remedy available under the UCC, applicable law, by written agreement or otherwise to Continental, including, but not limited to, bringing a lawsuit against Customer to seek judgment for replevin and/or damages. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Continental will send Customer reasonable notice of the time and place of any public sale or of the time after which any private sale or other disposition will be made. Any requirement of reasonable notice to Customer shall be met if such notice is mailed, postage prepaid, to Customer at the address of Customer designated at the beginning of this Agreement, at least 10 days before the day of any public sale or at least 10 days before the time after which any private sale or other disposition will be made. Customer agrees that ten days prior written notice of such sale or sales shall be reasonable notice. Continental may become the purchaser at any public sale. If Continental is required by law to discount any unpaid payment or other sums payable by Customer hereunder, then the parties hereto agree that the discount rate used shall be four percent (4%) annually. Upon any default, including failure to pay upon final maturity, the interest rate on the remaining amounts due under this Agreement and any other notes or instruments of debt, or other indebtedness, liabilities, or obligations hereunder, which are part of the Obligations set forth herein shall be 21.00% per annum. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law. Continental shall have the right to sue Customer, guarantors and all others persons responsible for all or a part of the Obligations for the remaining amounts of the Obligations that are then due together with attorney fees, court costs and all other fees, charges and expenses allowed for under this Agreement. Customer shall be liable for and agrees to pay the reasonable expenses incurred by Continental in enforcing its rights and remedies, in retaking, holding, testing, repairing, improving, selling, leasing or disposing of the Equipment, or like expenses. These expenses, together with interest thereon from the date incurred until paid by Customer at a rate of 21% per annum or the maximum contract rate allowed under applicable laws, which Customer agrees to pay, shall constitute additional obligations and shall be secured by and entitled to the benefits of this Agreement. The rights and remedies of Continental are cumulative and the exercise of any one or more of the rights or remedies shall not be deemed an election of rights or remedies or a waiver of any other right or remedy. Continental may remedy any default without waiving the default remedied and may waive any default without waiving any other prior or subsequent default. Continental may proceed against all or any of the Equipment or against any guarantor hereof, or may proceed contemporaneously or in the first instance against the Customer, in such order and at such times following default as Continental may determine in its sole discretion.

**16. STANDARDS FOR EXERCISING RIGHTS AND REMEDIES:** To the extent that applicable law imposes duties on Continental to exercise remedies in a commercially reasonable manner, Customer acknowledges and agrees that it is not commercially unreasonable for Continental to (a) fail to incur expenses reasonably deemed significant by Continental to prepare the Equipment for disposition, (b) fail to obtain third-party consents for access to Equipment to be disposed of, (c) advertise dispositions of Equipment through publications or media of general circulation, whether or not the Equipment is of a specialized nature, (d) contact other persons, whether or not in the same business as the Customer, for expressions of interest in acquiring all or any portion of the Equipment, (e) hire one or more professional auctioneers to assist in the disposition of Equipment, whether or not the Equipment is of a specialized nature, (f) dispose of Equipment by utilizing Internet sites that provide for the auction of assets of the types included in the Equipment or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (g) dispose of assets in wholesale rather than retail markets, or (h) disclaim disposition warranties. Customer acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by Continental would fulfill Continental's duties under the UCC or other law in any relevant jurisdiction in Continental's exercise of remedies against the Equipment and that other actions or omissions by Continental shall not be deemed to fail to fulfill such duties solely on account of not being indicated in this Section. Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any rights to the Customer or to impose any duties on Continental that would not have been granted or imposed by applicable law in the absence of this Section.

**17. EXPENSE OF ENFORCEMENT/ATTORNEY FEES:** All costs incurred by Continental in protecting the Equipment or any costs incurred by Continental in the event of a default by Customer shall be paid by Customer to Continental upon demand. Such costs shall include, but not be limited to, all Continental's attorney's fees incurred (including but not limited to pre-litigation attorney's fees and attorney's fees incurred in any litigation proceeding, bankruptcy case, adversarial proceeding, insolvency proceeding, mediation or arbitration), costs of taking possession and transporting the Equipment to such other place as designated by Continental, costs for restoring the Equipment to a good, safe condition and working order for the purpose of disposition of said Equipment and like expenses as designated throughout this Agreement.

**18. GOVERNING LAW, JURISDICTION AND VENUE: ALL MATTERS INVOLVING THE CONSTRUCTION, VALIDITY, PERFORMANCE, OR ENFORCEMENT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF UTAH.**

**CUSTOMER CONSENTS TO THE PERSONAL JURISDICTION OF THE COURTS OF THE STATE OF UTAH AND AGREES THAT AT CONTINENTAL'S SOLE OPTION, JURISDICTION AND VENUE (LOCATION) FOR ANY DISPUTE, SUIT OR ACTION ARISING UNDER OR IN RELATION TO THE AGREEMENT, AND ALL DOCUMENTS EXECUTED IN CONNECTION THEREWITH, SHALL LIE IN THE THIRD DISTRICT COURT IN SALT LAKE COUNTY, UTAH. CUSTOMER WAIVES THE RIGHT TO REMOVE ANY ACTION FROM STATE COURT TO FEDERAL COURT. CUSTOMER AND CONTINENTAL WAIVE THE RIGHT TO A JURY TRIAL. NOTWITHSTANDING, CONTINENTAL SHALL HAVE THE OPTION OF COMMENCING AN ACTION IN ANY COURT IN ANY STATE HAVING JURISDICTION OVER THE SUBJECT MATTER AND PARTIES TO THE TRANSACTION.**

**19. NOTICES:** Any notice required hereunder shall be given in writing and shall be effective when actually delivered, when delivered by a nationally recognized overnight courier, or if, mailed, three days after being deposited in the U. S. mail, as first class, postage prepaid or when delivered by certified or registered mail postage prepaid. Each of the parties shall be responsible for notifying the other party or parties in writing of any change of address. Customer represents that its exact legal names, state of incorporation, location of its chief executive office and/or its place of residence as applicable have been correctly identified to Continental.

**20. ENTIRE AGREEMENT:** This Agreement, together with any other signed written agreements between the parties concerning the subject matter herein, contains the entire agreement between the parties and shall be binding upon their respective heirs, executors, administrators, legal and/or representatives, successors and assigns; subject, however, to any other supplemental or other agreements in writing signed by the parties. This Agreement may not be altered, modified or amended, except in writing and signed by all parties. This agreement and instruments identified herein are a final expression of the agreement among the parties and may not be contradicted by evidence of any alleged oral agreement. With respect to the subject matter of this Agreement, except as expressly provided in this Agreement, all prior and contemporaneous agreements, arrangements and understandings among the parties are superseded and rescinded.

**21. WAIVERS AND RELEASE:** The forbearance on the part of Continental to exercise any right or remedy available hereunder in the event of Customer's default, or Continental's failure to demand punctual performance on any obligation of Customer shall not be deemed a waiver (A) of any such right or remedy, (B) the requirement of punctual performance, or (C) of any subsequent breach or default on the part of Customer. Customer and any guarantor or other party liable in any capacity with respect to the Obligations herein waive demand, notice of intention to accelerate, notice of acceleration, notice of nonpayment, presentment, protest, notice of dishonor and any other similar notice. Except for Continental's express contractual obligations contained in this Agreement, Customer waives any defenses which they might otherwise assert with respect to the Obligations and all of the related documents; and Customer, for themselves and their respective heirs, successors and assigns, release and forever discharge Continental and it's officers, directors, agents, attorneys, employees and affiliates, past, present and future, from any and all rights, claims, demands, damages, losses, liabilities, causes of action and counterclaims, whether now existing or hereafter arising, known or unknown, suspected or unsuspected, contingent or liquidated, disputed or undisputed, arising out of or relating in any way to any of the Obligations or to any document or instrument relating to any of the Obligations. Customer represents and warrants that each of them has the capacity and authority to grant the foregoing waiver and release and that none of them has heretofore assigned or transferred any of the rights and claims which are the subject of this section. Customer shall jointly and severally indemnify and hold harmless Continental and all of its parent, subsidiary and affiliated corporations and entities, past, present and future, as well as their respective officers, directors, agents, employees and attorneys, past present and future, from any and all claims, demands, losses, liabilities and causes of action which (i) the Customer has waived, released, and discharged under this section, and (ii) are brought by any assign, heir or successor in interest of any of the Customers or any other person claiming through the Customer or which may result from any act or omission of Customer.

**21 AUTHORITY TO SIGN; RESOLUTION:** If Customer is a partnership, LLC, or corporation (each individually referred to as the "Company" for the purposes of this paragraph), the undersigned warrants that (s)he is a general partner, if a partnership, Manager, if a limited liability company, or officer, if a corporation, and further warrants that (s)he has full authority from the Company to sign this Agreement and ancillary agreements relating to the Equipment as Continental may reasonable require from time to time and to obligate the Company. The undersigned certifies that (i) the Company is organized and existing under and by virtue of the laws of the State of Utah; (ii) all consents of the Company required by the Company's operating documents to be obtained for the execution, delivery and performance of the Loan 'Documents have been obtained and are in full force and effect, (iii) the Company is hereby authorized, directed, resolved and empowered to enter into this Agreement and its ancillary agreements relating to the Equipment; (iv) Continental is authorized to act upon this resolution; (v) this resolution now stands on the record of the books of the Company and is in full force and effect; and (vi) the Company will notify Continental in writing prior to any (a) change in the name and/or assumed business name of the Company, (b) change in the management of the Company, (c) change in the authorized signer(s), (d) conversion of the Company to a new or different type of business entity, and (e) change in any other aspect of the Company that directly or indirectly relates to any agreements between the Company and Continental. No change in the name of the Company will take effect until after Continental has been notified.

**23. CHANGE OF LOCATION:** Except as may otherwise be provided in this Agreement, Customer shall not remove the Equipment from the location designated above, without Continental's prior written consent; except that if the Equipment is of a type that is normally moved from site to site or constitutes mobile goods, as such term is defined in the Uniform Commercial Code, it may temporarily be removed from such location provided that it will be based at such location and stored there when not in use. In no event shall it be removed from the United States. Failure to obtain Continental's consent shall constitute an event of default under the terms of this Agreement. Upon request, Customer shall advise Continental of the exact location of movable Equipment. Continental may inspect the Equipment during normal business hours and enter the premises where the Equipment may be located for such purposes.

**24. ASSIGNMENT BY CONTINENTAL:** Customer shall recognize and hereby consents to any assignment of this Agreement by Continental.

**25. FINANCIAL STATEMENTS; CREDIT REPORTS AND CREDIT REPORTING:** Continental may require from time to time, and Customer agrees to furnish statements setting forth the financial condition and operations of Customer. Customer authorizes Continental, its successors, assigns and prospective assigns to obtain a personal credit profile on Customer or any guarantor from any credit reporting company and make any other credit inquiries that Continental determines are appropriate, in Continental's sole discretion. **Customer acknowledges and agrees that for business obligors, Continental may report the account payment history to one or more of the major business credit reporting agencies and, in the case of a personal obligor or guarantor, Continental may report to one or more of the personal credit reporting agencies.**

**26. SEVERABILITY:** If any provision of this Agreement is prohibited by or held invalid under applicable laws of any jurisdiction in which it is sought to be enforced, then such provision shall be considered severable and shall not invalidate the remaining provisions of this Agreement.

**27. COUNTERPARTS; SIGNATURES:** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same instrument. The parties intend and agree that a photocopy, facsimile, or electronically transferred copy (such as a scanned and emailed copy) of this document with their signatures thereon shall be treated as an original, and shall be deemed to be as binding, valid, genuine, and authentic as an original signature document or legally accepted electronic signature document for all purposes, including all matters of evidence.

**SECURED PARTY: CONTINENTAL BANK**

DocuSigned by:

By Jennifer Fletcher
6E535DF8DAAD47D...

**Name: Burton May**

**Title: Senior Vice President, Operations**

**Date:** 4/1/2024 | 3:35:29 PM MDT

**CUSTOMER: Pyle Transportation, Inc.**

DocuSigned by:

By Justin Allen Pyle
5518D89E24BC4DD...

**Name: Justin Allen Pyle**

**Title: President**

**Date:** 4/1/2024 | 10:59:22 AM PDT

**GUARANTY:**

Knowing that Continental will enter into agreements with Customer in reliance upon the existence of this Guaranty, Guarantor agrees with Continental as follows:

**1. GUARANTY:** Continental may, from time to time, enter into agreements with Customer. Continental is unwilling to enter into such agreements, including but not limited to the Equipment Finance Agreement ("Agreement") entered into with Customer concurrent with this Guaranty, unless Guarantor unconditionally guarantees to Continental the payment and performance of all obligations of Customer at any time owing to Continental. Accordingly, with the understanding that Continental, as defined in the Agreement, will enter into agreements with Customer, as defined in the Agreement, in reliance upon the existence of this Guaranty, Guarantor unconditionally and irrevocably guarantees to Continental without off-set or deduction, the prompt payment and performance of all indebtedness, obligations and liabilities of Customer at any time owing to Continental, whether direct or indirect, matured or un-matured, primary or secondary, certain or contingent or acquired or created by Continental (individually, a "Guaranteed Obligation" and, collectively, the "Guaranteed Obligations"). This Guaranty is a guaranty of payment and not a guaranty of collection. Guarantor guarantees to Continental the punctual and faithful performance by Customer of each and every Guaranteed Obligation. If Customer defaults in the payment or performance of any Guaranteed Obligation, if there exists any event or condition which, with notice and/or the passage of time, would constitute a default under any Guaranteed Obligation, or if there is a liquidation, bankruptcy, assignment for the benefit of creditors or similar proceeding affecting the status, existence, assets or Obligations of Customer, Guarantor shall pay directly to Continental the sums which Customer is obligated to pay to Continental, whether by acceleration or otherwise, and shall promptly perform all other Guaranteed Obligations. If Continental is required to return any payment made to Continental by or on behalf of Customer, whether as a result of Customer's bankruptcy, reorganization or otherwise, Guarantor acknowledges that this Guaranty covers all such amounts, notwithstanding that the original of this Guaranty may have been returned to Guarantor and/or otherwise cancelled.

**2. CONTINUING NATURE OF GUARANTY**: The provisions of this Guaranty shall extend to and apply to all Obligations of the Customer under all agreements executed by Customer for the benefit of Continental, whether executed before or after the date of this guaranty, and whether set forth in separate agreements, schedules, applications, orders or Equipment documents. This is a continuing Guaranty and shall not be affected or discharged by the death of the undersigned, but shall bind Guarantor's heirs and personal representatives, and shall inure to the benefit of any successors or assigns of Continental. The execution of this Guaranty shall not extinguish, release or waive any Obligations, promises, or guaranties contained in any Guarantee previously executed by Guarantor for the benefit of Continental. Guarantor may prospectively revoke this Guaranty by sending written notice, by certified mail, return receipt requested, to Continental at the address for Continental specified in the Agreement or sent to any address of Continental Bank shown on the records of the State of Utah Division of Corporations and Commercial Code or as otherwise to the most current address provided by Continental to Customer in writing from time to time (the "Revocation Notice"). The revocation of this Guaranty shall not be effective with respect to any Guaranteed Obligation arising on or prior to the date occurring fifteen (15) days after Continental's receipt of the Revocation Notice (the "Revocation Date") or arising at any time after the Revocation Date, if arising as the result of a commitment made by Continental to Obligor on or prior to the Revocation Date.

**3. ABSOLUTE NATURE OF GUARANTY:** The obligations of Guarantor under this Guaranty are absolute and unconditional. Guarantor shall not be released from such obligations for any reason nor shall such obligations be reduced, diminished or discharged for any reason, including but not limited to:

(3.1) Modifications and Indulgences. Any modification, renewal or alteration of any agreement, document or instrument relating to any Guaranteed Obligation, or any indulgence, adjustment, preference, extension or compromise made by Continental in favor of Customer or Guarantor. Guarantor consents to any extensions or modifications granted to Customer and the release and compromise of any Obligations of Customer or any other obligors and guarantors without notice and without in any way releasing the undersigned from his or her obligations.
(3.2) Condition of Customer or Guarantor. Any insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or similar proceeding affecting Customer or Guarantor; any sale, lease or other disposition of any of the assets of Customer or Guarantor; any reorganization of, or change in the composition of the shareholders, partners or members of, Customer or Guarantor; or any termination of, or other change in, the relationship between Customer and Guarantor.
(3.3) Invalidity of Guaranteed Obligations. The invalidity, illegality or unenforceability of any Guaranteed Obligation for any reason whatsoever, including, but not limited to: the existence of valid defenses, counterclaims or off-sets to any Guaranteed Obligation; the violation of applicable usury laws by any Guaranteed Obligation; or the inauthenticity of any document or instrument relating to the Guaranteed Obligations.
(3.4) Release of Customer. Any complete or partial release of Customer or any other party from any Guaranteed Obligation.
(3.5) Release of Equipment; Care of Equipment; Status of Liens. Any release, surrender, exchange, deterioration, waste, loss or impairment of any collateral or equipment ("Equipment") securing payment of any Guaranteed Obligation, whether negligent or willful; the failure of Continental or any other party to exercise reasonable care in the preservation, protection, sale or other treatment of any of the Equipment; the failure of Continental to create or properly perfect any security interest intended to be given by Customer in connection with any Guaranteed Obligation (a "Security Interest"); the unenforceability of any Security Interest; the subordination of any Security Interest to any other lien or encumbrance; or the taking or accepting by Continental of any other security for, or assurance of payment of, any Guaranteed Obligation.
(3.6) Other Action or Inaction. Any other action or inaction on the part of Continental, whether or not such action or inaction prejudices Guarantor or increases the likelihood that Guarantor will be required to pay or perform any Guaranteed Obligation pursuant to the terms hereof.

It is the obligation of Guarantor to discharge the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action or omission whatsoever, whether or not particularly described herein. Guarantor is not entering into this Guaranty in reliance on the value or the availability of any of the Equipment. Guarantor acknowledges that Guarantor may be required to pay the Guaranteed Obligations, in full, without the assistance or support of any other party. Guarantor has not been induced to enter into this Guaranty on the basis that any party other than Customer will be liable to perform any Guaranteed Obligation or that Continental will look to any other party to perform any Guaranteed Obligation. If this Guaranty is signed by more than one party, the obligations of such parties are joint and several and Continental may release, or settle with, any of such parties without affecting the liability of any other party to this Guaranty. To the extent that this Guaranty is secured by property of Guarantor, Continental shall not be obligated to release its security interest in such property until all applicable preference periods have passed with respect to payments made to Continental by or on behalf of Customer.

**4. WAIVERS:** Guarantor waives:
(4.1) Action Against Others. Any right to require Continental to: institute suit or exhaust remedies against Customer or any other party liable for any Guaranteed Obligation; enforce Continental's rights in any of the Equipment or other security which is at any time given to secure any Guaranteed Obligation; enforce Continental's rights against any other guarantor of any Guaranteed Obligation; join Customer or any other party liable for any Guaranteed Obligation in any action seeking to enforce this Guaranty; or exhaust any other remedies available to Continental or resort to any other means of obtaining payment or performance of any Guaranteed Obligation. Guarantor waives any defense arising by reason of any defense of Customer, or by reason of the cessation, from any cause whatsoever, of the liability of Customer under the Agreement.
(4.2) Notices. Notice of the amount of credit extended by Continental to Customer at any time, whether primary or secondary; notice of the modification or extension of any Guaranteed Obligation; notice of a default or other non-performance by Customer in connection with any Guaranteed Obligation; notice of the transfer or disposition by Continental of any Guaranteed Obligation; notice of the repossession, sale or other disposition of any of the Equipment; notice of the acceptance of this Guaranty by Continental; demand and presentation for payment upon Customer or any other party liable for any Guaranteed Obligation; protest, notice of protest and diligence of bringing suit against Customer or any other party; and any other action or inaction on the part of Continental in connection with this Guaranty or any Guaranteed Obligation.
(4.3) Subrogation. Any right which Guarantor may at any time have against Customer, or any other party liable for any Guaranteed Obligation, as the result of the performance by Guarantor of its Obligations under this Guaranty, including, but not limited to, contractual, statutory and common law rights of subrogation, reimbursement and indemnification.

**5 AUTHORITY TO SIGN; RESOLUTION:** If Guarantor is a partnership, LLC, or corporation (each individually referred to as the "Company" for the purposes of this paragraph), the undersigned warrants that (s)he is a general partner, if a partnership, Manager, if a limited liability company, or officer, if a corporation, and further warrants that (s)he has full authority from the Company to sign this Agreement and ancillary agreements relating to the Equipment as Continental may reasonable require from time to time and to obligate the Company. The undersigned certifies that (i) the Company is organized and existing under and by virtue of the laws of the State of Utah**;** (ii) all consents of the Company required by the Company's operating documents to be obtained for the execution, delivery and performance of the Loan 'Documents have been obtained and are in full force and effect, (iii) the Company is hereby authorized, directed, resolved and empowered to enter into this Agreement, including the Guaranty, and its ancillary agreements relating to the Equipment; (iv) Continental is authorized to act upon this resolution; (v) this resolution now stands on the record of the books of the Company and is in full force and effect; and (vi) the Company will notify Continental in writing prior to any (a) change in the name and/or assumed business name of the Company, (b) change in the management of the Company, (c) change in the authorized signer(s), (d) conversion of the Company to a new or different type of business entity, and (e) change in any other aspect of the Company that directly or indirectly relates to any agreements between the Company and Continental. No change in the name of the Company will take effect until after Continental has been notified.

**6. MISCELLANEOUS:** Guarantor: (a) consents to the jurisdiction of the state courts of Utah and venue in Salt Lake County, Utah, choice of which is at the option of Continental as more specifically explained in the Equipment Finance Agreement and waives the right to remove any action from State court to Federal Court; (b) **WAIVES THE RIGHT TO A JURY TRIAL with respect to any matter arising**

**under or in connection with this Guaranty and the Guaranteed Obligations**; (c) unconditionally promises to pay Continental all sums at any time due and unpaid under the Agreement, plus any costs of collection, including reasonable attorneys' fees with or without trial, before and after judgment and including upon appeal; (d) acknowledges having fully read the Agreement and this Guaranty and agrees to all terms therein and herein; (e) has an interest, financial or otherwise in Customer, and/or it is to the benefit of Guarantor that Continental enter into the Agreement with Customer and Guarantor will receive direct or indirect benefit from the creation of the Guaranteed Obligations; (f) Continental has not made any representation, warranty or statement to induce Guarantor to execute this Guaranty; (g) Guarantor has read the Agreement and this Guaranty in full, finds the terms acceptable, and acknowledges that Continental would be unwilling to enter into the Agreement without the Guaranty, (h) authorizes Continental, its successors, assigns and prospective assigns to obtain a personal credit profile on Guarantor from any credit reporting company and make any other credit inquiries that Continental determines are appropriate, in Continental's sole discretion, **and agrees that for business obligors, Continental may report the account payment history to one or more of the major business credit reporting agencies and, in the case of a personal obligor or guarantor, Continental may report to one or more of the personal credit reporting agencies**, (i) all telephonic communications between Guarantor and Continental are subject to recording by Continental and Guarantor acknowledges and consents to same, and (j) as of the date hereof, and after giving effect to this Guaranty and the contingent obligations contained herein, Guarantor is solvent and has assets which, when fairly valued, exceed its liabilities. This Guaranty shall not be deemed to create any right in any party except as provided herein and shall inure to the benefit of and be binding upon the successors and assigns of the parties. This Guaranty constitutes the entire agreement of Guarantor and Continental relative to the subject matter hereof. No modification of or supplement to this Guaranty shall bind Continental unless the same is in writing and is signed by an authorized officer of Continental. Any provision hereof found to be invalid by the courts having jurisdiction shall be invalid only with respect to such provision (and then only to the extent necessary to avoid such invalidity). The offending provision shall be modified to the maximum extent possible to confer upon Continental the benefits intended thereby. Such provision as modified and the remaining provisions hereof shall be construed and enforced to the same effect as if such offending provision or portion thereof had not been contained herein, to the maximum extent possible. The failure of any party to enforce the provisions of this Agreement shall not constitute a waiver unless specifically stated in writing, signed by the party whose rights are deemed waived, regardless of a party's knowledge of a breach hereunder.

**7.** **SIGNATURE; COUNTERPARTS; AUTHORIZATION**: This Guaranty may be executed either by electronic signature or in writing and in any number of counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same instrument. Guarantor authorizes Continental to insert the date, if left blank, on the appropriate documents after delivery thereof and receipt of an Acceptance Certificate with respect thereto. The parties intend and agree that a photocopy, facsimile, or electronically transferred copy such as a scanned and emailed copy of this document with their signatures thereon shall be treated as an original, and shall be deemed to be as binding, valid, genuine, and authentic as an original-signature document for all purposes, including all matters of evidence.

GUARANTOR(S):

DocuSigned by:

By: Justin Allen Pyle

5518D89E24BC4DD...

Name: Justin Allen Pyle

Address: 313 7th Street

Correctionville, Iowa 51016

Date: 4/1/2024 | 10:59:22 AM PDT